IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

MICHAEL JERMAINE GREENE,

       Plaintiff,

v.                           Civil Action No. 5:16CV51
                                        (STAMP)
SIDNEY FEASTER and
DOUG WHITE,

       Defendants.

**MEMORANDUM OPINION AND ORDER**
**DENYING PLAINTIFF'S EXCESSIVE FORCE CLAIM**

I. <u>Introduction</u>

On April 18, 2016, the <u>pro se</u> plaintiff, Michael Jermaine Greene ("Greene"), an inmate then-incarcerated at the Northern Correctional Facility[1] in Moundsville, West Virginia, initiated this case by filing a civil rights complaint against the above-named defendants pursuant to 42 U.S.C. § 1983. ECF No. 1. Along with his complaint, the plaintiff filed a motion to proceed <u>in forma pauperis</u> with supporting documents. ECF Nos. 2, 3, 4. The plaintiff was granted permission to proceed as a pauper and directed to pay an initial partial filing fee on April 26, 2016. ECF No. 7. Pursuant to a Show Cause Order entered on June 20, 2016, the plaintiff was directed to show cause why his case should not be dismissed for the failure to prosecute. ECF No. 11. The plaintiff filed a response to the Show Cause Order on June 23,

_____

[1]Petitioner is presently incarcerated at the Mt. Olive Correctional Center ("MOCC") in Mt. Olive, West Virginia.

2016.  On July 6, 2016, the plaintiff paid the initial partial filing fee.  ECF No. 16.

On August 8, 2016, the plaintiff moved to voluntarily dismiss his case.  ECF No. 20.  By order entered August 10, 2016, the motion to dismiss was granted; the case was dismissed without prejudice; the in forma pauperis order was vacated; and the plaintiff was relieved of the obligation to pay the balance of his filing fee.  ECF No. 21 at 1.  On August 12, 2016, the plaintiff filed a Notice of Voluntary Dismissal.  ECF No. 23.  On September 6, 2016, the plaintiff wrote a letter to the Clerk of Court, attaching a Memorandum from the Huttonsville Correctional Center ("HCC").  ECF No. 27.  By order entered September 7, 2016, the letter was construed as a motion to reopen the case; the case was reopened and reinstated to the active docket; and the in forma pauperis order was reinstated.  ECF No. 28.  On September 28, 2016, the plaintiff filed a demand for a jury trial and a motion to appoint counsel.  ECF Nos. 30, 31.

On October 5, 2016, United States Magistrate Judge James E. Seibert conducted a preliminary review of the complaint, determined that summary dismissal was not warranted at that time and directed the defendants to answer the complaint.  ECF No. 33.  On November 3, 2016, the defendants filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment with a memorandum in support, attaching an affidavit and an exhibit.  ECF Nos. 39, 40.

On November 7, 2016, a <u>Roseboro</u>[2] Notice and Direction to Clerk to correct the spelling of the defendants' names on the docket was issued. ECF No. 43. The plaintiff filed a response in opposition on November 23, 2016. ECF No. 51. On December 5, 2016, the defendants filed a reply. ECF No. 52. On March 1, 2017, the plaintiff filed a document docketed as Supplemental Evidence, attaching copies of four Inmate Medical Service Requests. ECF No. 54.

On May 24, 2017, Magistrate Judge James E. Seibert entered a Report and Recommendation, recommending that the defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment be granted and that the plaintiff's complaint be dismissed with prejudice. ECF No. 57. On June 1, 2017, Greene filed a letter motion to withdraw due to improper venue. ECF No. 59. On June 14, 2017, Greene filed his objections to the Report and Recommendation. ECF No. 61. On August 16, 2017, after a review of the Report and Recommendation and objections, the Court then issued an order adopting the magistrate judge's Report and Recommendation. ECF No. 62. In its order, the Court made an independent <u>de novo</u> consideration of the recommendations to which objections were filed; the remaining recommendations, to which Greene filed no objection, were reviewed using the clearly erroneous standard. The Court then concluded that the magistrate judge's recommendation was

---

[2]<u>Roseboro v. Garrison</u>, 528 F.2d 309 (4th Cir. 1975).

3

proper, and that Greene's objections failed to meet the heavy burden specifically prescribed by the Eighth Amendment. Id.

Greene filed a notice of appeal. ECF No. 65. On appeal, Greene reiterated the facts of this case, claiming he was "unlawfully" sprayed, and argued that the District Court erred by not requesting the video footage to review before deciding his excessive force claim. (4th Cir. ECF No. 8-1)(17-7179).

In an unpublished per curiam opinion issued on May 2, 2018, the United States Court of Appeals for the Fourth Circuit affirmed in part, finding that Greene had failed to plead that the defendants were responsible for the allegedly retaliatory acts of losing his medical services request forms, and that he had not objected to the magistrate judge's recommendation to dismiss his deliberate indifference claim, thus waiving appellate review of the claim. Further, the Fourth Circuit vacated in part, remanding the plaintiff's excessive force claim, finding that the Court had erred by failing to treat Greene's verified complaint as the equivalent of the defendants' sworn affidavit in light of World Fuel Servs. Trading, DMCC v. Hebei Prince Shipping Co., 783 F.3d 507, 516 (4th Cir. 2015), and in granting summary judgment to the defendants on the excessive force claim. Tolan v. Cotton, 572 U.S. 650, 659 (2014). See ECF No. 71. The Fourth Circuit further noted that "the videotape of the incident might ultimately resolve the

parties' key factual dispute — whether Greene was complying with Defendants' orders at the time he was pepper sprayed[.]" Id. at 4.

On August 14, 2018, the Court entered an order referring the case to United States Magistrate Judge Michael John Aloi. ECF No. 77. By Order entered August 13, 2018, Magistrate Judge Aloi directed the defendants to file a copy of the February 1, 2016 surveillance video of the pepper spray incident at issue. ECF No. 76. The defendants sent copies of two DVDs to Magistrate Judge Aloi on August 16, 2018; on August 22, 2018, the DVDs were forwarded to the Wheeling Office of the Clerk of Court for review by the Court. Id.

On August 23, 2018, the plaintiff filed a second Motion to Appoint Counsel (ECF No. 81) and his First Set of Interrogatories and First Request for Production of Documents. ECF Nos. 82, 82-1. On August 24, 2018, the defendants filed a motion for an indefinite extension of time in which to respond to the plaintiff's discovery request until the Court had completed review of the record, including the surveillance video. ECF No. 84. By Order entered August 28, 2018, the plaintiff's First Set of Interrogatories and First Request for Production of Documents were stricken from the record as premature and returned to him, and discovery was stayed. ECF No. 85. By separate Orders entered the same day, the plaintiff's second Motion to Appoint Counsel and the defendants'

motion for the indefinite extension of time to respond to the plaintiff's discovery requests was denied as moot. ECF No. 86, 87.

On August 30, 2018, the plaintiff filed an affidavit[3] and a third Motion to Appoint Counsel. ECF Nos. 88, 89. On September 4, 2018, the plaintiff filed a fourth Motion to Appoint Counsel and a Motion for Leave for Discovery. ECF Nos. 90, 91. On September 5, 2018, the plaintiff filed a response to the defendants' motion for the indefinite extension of time to respond to his initial discovery requests (ECF No. 92) and a Motion to Schedule Conference (ECF No. 93).

On October 15, 2018, the plaintiff filed a copy of a letter to defendants' counsel, offering to settle the case. ECF No. 96. On

---

[3]The affidavit reiterated the claims in the complaint and raised new allegations, accusing the defendants of having retaliated against him by tampering with his mail and his food, causing him to be hospitalized on October 2016, and to have "received mental illness . . . damages to his kidneys and liver: [sic] small pericardial effusion that got resolved in Hospital [sic]." See ECF No. 88 at 3.

Further, the affidavit contends that after plaintiff was transferred from HCC to MOCC, he found that HCC staff "had a nurse place a liquid item inside Mr. Greene['s] body that allowed the (HCC) and (MOCC) staff to know what Mr. Greene is thinking and bring pain to his body 24/7. (HCC[)] and (MOCC) got radio's [sic] placed all over the prison that got a female and male speaking . . . about Mr. Greene and what he [sic] doing in his cell. In other words, with this liquid item inside Mr. Greene, the (MOCC) staff/CO's [sic] know what Mr. Greene stating to the court and Defendants['] counsel[] before he send it out in the mail. Mr. Greene only state[s] this because an appointed attorney can/will affirm it on his/her visit upon proving in best interest." ECF No. 88, ¶ 10 at 3.

Because these new claims were not raised until well after the defendants filed their dispositive motion, and MOCC staff are not defendants in this action, they will not be considered here.

November 19, 2018, the plaintiff filed certificates of service, evincing having served defendants with his First Set of Interrogatories and First Request for Production of Documents, to which he had attached copies of each. ECF Nos. 97, 97-1, 98, 98-1. By Order entered November 20, 2018, Plaintiff's First Set of Interrogatories and First Request for Production of Documents were again stricken from the record as premature; discovery was again stayed; and the defendants were directed to disregard the discovery requests. ECF No. 100. On February 11, 2018, Greene filed a Notice of Inquiry regarding the status of the case. ECF No. 103.

## II. Procedural History

As noted in the Report and Recommendation, the complaint raised three claims: (1) excessive force arising out of a February 1, 2016 incident at HCC during which Greene was pepper sprayed; (2) retaliation by the defendants and possibly other correctional officers ("COs") for "filing paper work," by making one of Greene's sick call requests go missing (ECF No. 1-1 at 2); and (3) deliberate indifference to serious medical needs, because Greene did not receive timely or adequate medical care after the pepper spray incident. As relief, Greene sought $200,000.00 in damages. ECF No. 1 at 10.

The defendants' dispositive motion argued that the complaint should be dismissed or summary judgment granted in their favor, because (1) the complaint failed to state a claim upon which relief

7

can be granted (ECF No. 40 at 4); (2) defendants were entitled to qualified immunity (id. at 7); (3) Greene's injury from the incident was de minimis (id. at 10); (4) Greene failed to state a cognizable excessive force claim (id. at 11); and (5) Greene failed to state a cognizable deliberate indifference claim (id. at 13).

In response, Greene reiterated some of his claims and attempted to refute the defendants' arguments on the same. ECF No. 51 at 1-2. In reply, the defendants noted that Greene's response effectively admitted that his complaint could not survive their dispositive motion; failed to address the arguments made in that motion; and only restated his "deficient allegations" without explaining why his complaint should survive a summary judgment motion. ECF No. 52 at 1-2.

Here, this Court will specifically address the plaintiff's remaining claim of excessive force. For the reasons set forth below, having considered Greene's claim in light of the new evidence provided by the DVD video footage of the incident, the Court again denies the claim.

### III. <u>Analysis</u>

In general, the Eighth Amendment prohibits "cruel and unusual punishment." <u>Farmer v. Brennan</u>, 511 U.S. 825 (1994). The cruel and unusual punishment clause of the Eighth Amendment applies to the States through the Due Process Clause of the Fourteenth

Amendment to the United States Constitution. See <u>Wilson v. Seiter</u>, 501 U.S. 294 (1991).

In order to comply with the Eighth Amendment, prison punishment must comport with "the evolving standards of decency that mark the progress of a maturing society." <u>Estelle v. Gamble</u>, 429 U.S. 97, 102 (1976). "A prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." <u>Farmer v. Brennan</u>, 511 U.S. at 837.

Moreover, while courts should give deference to a jail official's determination of what measures are necessary to maintain discipline and security, "the unnecessary and wanton infliction of pain" constitutes cruel and unusual punishment which is prohibited by the Eighth Amendment. <u>Whitley v. Albers</u>, 475 U.S. 312, 321-22 (1986). In order for a plaintiff to prove a claim of excessive force, the plaintiff must first establish that "the alleged wrongdoing was objectively 'harmful enough' to establish a constitutional violation." <u>Norman v. Taylor</u>, 25 F.3d 1259, 1262 (4th Cir. 1994) (<u>en banc</u>), <u>cert. denied</u>, 513 U.S. 1114 (1995) (quoting <u>Hudson v. McMillian</u>, 503 U.S. 1, 8 (1992)). Second, the plaintiff must show that the prison officials inflicted unnecessary

and wanton pain and suffering.  <u>Hudson</u>, 503 U.S. at 6; <u>Williams v.</u>
<u>Benjamin</u>, 77 F. 3d 756 (4th Cir. 1996).

With regard to prison disturbances, whether unnecessary and
wanton pain and suffering was inflicted "ultimately turns on
whether force was applied in a good faith effort to maintain or
restore discipline or maliciously and sadistically for the very
purpose of causing harm."  <u>Whitley</u>, 475 U.S. at 320-21.  In
determining whether the defendant acted maliciously and
sadistically, the following factors should be balanced: (1) "the
need for application of force;" (2) "the relationship between the
need and the amount of force that was used;" (3) "the extent of the
injury;" (4) the threat reasonably perceived by the responsible
official; and (5) "any efforts made to temper the severity of a
forceful response."  <u>Id.</u> at 321; <u>see also</u> <u>Williams</u>, 77 F.3d at 762.

Moreover, in the Fourth Circuit, "absent the most
extraordinary circumstances, a plaintiff cannot prevail on an
Eighth Amendment excessive force claim if his injury is <u>de</u>
<u>minimis</u>."  <u>Norman</u>, 25 F.3d at 1263.  Although a <u>de minimis</u> injury
reveals that <u>de minimis</u> force was used, <u>id.</u> at 1262, the Fourth
Circuit has held that in certain circumstances, a claim may be made
even if the injury is <u>de minimis</u>.  Specifically, the Fourth Circuit
has stated:

> There may be highly unusual circumstances in which a
> particular application of force will cause relatively
> little, or perhaps no, enduring injury, but nonetheless
> will result in an impermissible infliction of pain.  <u>Cf.</u>

10

> Hudson, 503 U.S. at ---, 112 S. Ct. at 1000 ("diabolic" or "inhuman" physical punishment unconstitutional, regardless of injury). In these circumstances, we believe that either the force used will be "of a sort 'repugnant to the conscience of mankind,' and thus expressly outside the de minimis force exception, see Hudson, 503 U.S. at ---, 112 S. Ct. at 1000 (citations omitted), or the pain itself will be such that it can properly be said to constitute more than de minimis injury."

Norman, at 1264, n.4. Further, prison officials violate the Eighth Amendment by using "mace, tear gas or other chemical agents in quantities greater than necessary or for the sole purpose of infliction of pain." Williams v. Benjamin, 77 F.3d 756, 763 (4th Cir. 1996) (internal quotation marks omitted); see also Iko v. Shreve, 535 F.3d 225, 239-40 (finding use of pepper spray during cell extraction of nonconfrontational inmate constituted excessive force).

As previously noted, Greene alleges that at around 3:00 p.m. on Monday, February 1, 2016, he pushed his call light to talk to staff but because he got no response "for at least an hour or so" he began "repeatedly hitting . . . [his] call light again" and then kicked his cell door "a good (2) two to (3) three times." ECF No. 1 at 7. He avers that defendants Sidney Feaster ("Feaster") and Doug White ("White") came to his cell door and told him to stop kicking or he would be sprayed. Id. Greene asserts that he replied "OK, no problem" and the two officers then walked a short distance away, where he overheard them say "we can see it on the camera." Id. at 8. The officers then returned "out of the blue

11

(for no reason)" and told him to back up; Greene complied; White then ordered Feaster to spray Greene.  Id.  Greene contends that Feaster then sprayed him for two to three seconds and then he was left in his cell for at least five minutes before being permitted to shower for "five minutes tops."  Id.

Attached to Greene's complaint is a February 10, 2016 response to his Grievance # Hcc-E1-47, which states in pertinent part:

> On 01 February 2016 staff on unit E-1 did address the issue of you repeatedly hitting your call light.  You then began kicking your cell door.  Staff did address This [sic] issue with you several times, due to your escalation in behavior you were exposed to Oloeresin [sic] Capsicum.  You were then removed from your cell and decontaminated.  Once decontaminated you were Assessed [sic] by medical staff.  At this time you had no complaints and you were returned to your cell.

ECF No. 1-1 at 3.

Feaster and White deny that anything other than reasonable force was used to get Greene to stop repeatedly hitting his call light and kicking his cell door when he was told to, but when his behavior escalated, he was subjected to pepper spray.  ECF No. 40 at 2.  In support, they attach a sworn affidavit by Marvin Plumley ("Plumley"), HCC Warden, attesting to the fact that the HCC's Use of Force Committee reviewed reports of the February 1, 2016 incident and concluded that the use of force was "minimal and justified."  ECF No. 40-1 at 1.  Defendants also produced a February 3, 2016 memorandum to Plumley from AWS Bryan K. Lanham,

regarding the "Use of Force Review Committee Findings on Greene, Michael," stating in pertinent part, that:

> [o]n Monday 01 February 2016, at approximately 1626 hours, COII Sydney Feaster did respond to Cell #41 on Unit E-1 housed by I/M Greene, Michael #3520461, due to him kicking his cell door. COII Feaster did give multiple direct orders to stop kicking his cell door. I/M Greene refused by continuing to kick his cell door. At this time COII Feaster did deploy two . . . one . . . second burst[s] of Sabre Red MK-IX (Tag # A1112) into I/M Greene's cell. Lt. Gary Arbogast was notified of the incident and reported to the cell and instructed him to submit to mechanical restraints. I/M Greene did comply at this time and was removed from his cell. COII Mathew [sic] Balducci did place a spit hood on I/M Greene. I/M Greene was escorted to shower #1 on Unit E-1 to begin the decontamination process. Upon completion of the decontamination process, I/M Greene was medically assessed by RN Dana Mahanes. I/M Greene['s] assigned cell was decontaminated and I/M Greene was returned to his cell without further incident.
>
> After a review of video footage and written reports, it is the findings [sic] that the force used was minimal and justified.

ECF No. 40-2 at 1. Defendants also attached a copy of an Incident Report filed by defendant Feaster, stating in pertinent part that:

> [o]n Monday 01 February 2016 at approx. 1626 hours I . . . did respond to cell 41 on unit E-1 which Inmate Greene, Michael # 3520461 is housed[.] inmate was kicking his cell door at this time I COII Sidney Feaster did give multiple direct orders to stop kicking the cell door[.] Inmate Greene continued to kick the cell door. At this time I . . . did deploy two one second burst of Sabre red MK 9 tag #A1112. I . . . did assist in escorting inmate Greene to the decontamination shower on unite E-1. When decontamination was complete I also escorted inmate Greene . . . to the front of the E-1 control room to be assessed by RN Dana Mahanes . . .

Id. at 3. Defendant White's report of the incident was that:

> [o]n Monday 01 February 2016 at approx. 1636 hours I
> . . . did go to cell 41 on unit E-1 due to inmate Greene,
> Michael . . . kicking the cell door.  I . . . did escort
> . . . Greene . . . from cell 41 to the decontamination
> shower on unit E-1.  When decontamination was complete I
> . . . did escort . . . Greene and placed him in front of
> the E-1 Control room.

Id. at 5.  A report of the incident was also created by Matthew

Balducci, C.O. II, stating:

> On Monday 01 February 2016, at approximately 1630 hrs, I
> . . . did respond to an incident on Unit E-1 with Inmate
> Greene, Michael . . .  I . . . provided extra security on
> Unit E-1.  Then at approximately 1636 hrs Inmate Greene
> . . . was taken out of Cell 41 at that time I . . . did
> place a spit hood onto Inmate Greene . . .  I . . . then
> provided  extra  security  during  the  decontamination
> process.  At approximately 1705 hrs I . . . along with
> Corporal Doug White did escort Inmate Greene . . . back
> onto the Unit E-1 pod and placed I/M Greene . . . into
> shower number 1.  At approximately 1710 hrs I . . . then
> removed all of the magnets off of the cell door windows.

Id. at 7.  Correctional Officer II Timothy Herron was also on duty

that day, and provided his version of the event:

> [a]t approximately 1428 I . . . did respond to an
> incident on unit E-1 with I/m Greene Michael . . .  Lt.
> Robert Kesling did tell me . . . to get the camera and
> record the incident.  I . . . did record the entire
> incident through the decontamination process.

Id. at 9.  An Incident Report was also prepared by Lt. Gary

Arbogast, who stated:

> [o]n 01 February 2016 at approximately 1630 hrs. I . . .
> was notified by Lt. Robert Kesling that inmate Greene,
> Michael . . . had been exposed to Oleoresin Capsicum.  At
> approx. 1632 hrs. I did arrive on unit E-1 and was
> briefed by Lt. Kesling.  At approx. 1636 hrs. I did
> approach Cell 41 . . . housing Inmate Greene.  Once at
> the cell door I did instruct . . . greene [sic] to cuff
> up at wich [sic] time he did comply.  Inmate Greene was
> secured and removed from his cell and escorted to the

14

shower for decontamination. Once decontaminated . . .
Greene was assessed by nurse Dana Mahanes. Inmate Greene
was returned to his cell without further incident.

Id. at 11. Dana Mahanes RN prepared her own report of the
incident:

> [o]n February 1st, 2016 at approximatley [sic] 1640
> called to E-1 to assess Inmate Greene Michael . . . after
> decontamination of a chemical agent. Inmate Greene . . .
> denied any injuries, vital signs stable, instructed
> Inmate Greene . . . if experienced any symptoms or
> further complaints to notify Medical[.] Inmate Greene
> . . . voiced understanding.

Id. at 13. Finally, a February 10, 2016 response by Lt. Gary
Arbogast to Greene's grievance, attached to Greene's complaint,
notes that:

> Mr. Greene in response to the above Grievance. On 01
> February 2016 staff on unit E-1 did address the issue of
> you repeatedly hitting your call light. You then began
> kicking your cell door. Staff did address This [sic]
> issue with you several times, due to your escalation in
> behavior you were exposed to Oloeresin Capsicum. You
> were then removed from your cell and decontaminated.
> Once decontaminated you were Assessed [sic] by medical
> staff. At this time you had no complaints and you were
> returned to your cell.

ECF No. 1-1 at 3.

On remand, pursuant to the Court's order, the defendants
produced copies of two DVDs, one contained three views of HCC
surveillance video with no audio. The other contained video
footage from a hand-held camera with audio,[4] which captured the
events from shortly after the pepper spray incident through the

_____

[4]The audio on the hand-held camera footage is poor at times.

time Greene was removed from his cell, taken to the shower for decontamination, and then medically assessed.

View One and View Two of the HCC surveillance video both begin at approximately 5.22.30 p.m. on February 1, 2016, and end at 5.45.26 p.m. View Two was not as useful as View One; while it captured the same events shown on View One, it did so from the opposite end of the cell block from Greene's cell, too far away for the images to be plainly visible; however, it did more clearly show how far down the cell block the two COs walked before they returned to Greene's cell and used the OC spray on him.

View Three of the HCC surveillance video also begins at 5.22.30 p.m., but as it is surveillance video of the first floor tier before Greene arrived there, at first, it only shows random, unrelated correctional officer activity before Greene is brought downstairs for a decontamination shower. It then picks up from where View One and Two end, providing footage of the COs escorting Greene when he was brought downstairs. It then ends when Greene finishes the shower and is taken to another area for medical assessment. The medical assessment itself is only seen on the hand-held camera footage.

A review of the video footage shows that at 5.22.31 p.m.,[5] two COs were standing very close to Greene's cell,[6] talking to him through the closed door; because there is no audio, their conversation is inaudible; Greene, inside the cell, is not visible. It appears that, consistent with the complaint, it is at this point that the COs are telling Greene to stop kicking his cell door or he will be sprayed.  At 5.22.49 p.m., the two COs turn and walk away from Greene's cell down the second floor cell block, away from the camera; when three cells past Greene's cell, they stop and appear to chat briefly with the occupant of a cell there; then, at 5.23.03 p.m., they continued walking down the block again.[7]  At 5:23.09 p.m., they suddenly stop in unison and whirl around, as if

_____

[5]It is unclear why there appears to be a one-hour difference in the defendants' renditions of what happened in their incident reports versus the times shown on the surveillance and hand-held camera footage, unless the cameras were set on daylight savings time and never corrected when the time changed.

[6]The surveillance video does not include any footage of the earlier part of Greene's claim regarding that at around 3:00 p.m. that day he pressed his cell light and never got a response.  It appears then, that the surveillance video began when about "an hour or so" later, as Greene admits, he began repeatedly hitting his call light and then kicking his door.

[7]View One does not clearly show how many cells past Greene's that they walked, because the angle of the View One surveillance camera is too "straight-on" relative to the cell block to show; had it been positioned slightly more at an angle, it would have been possible to see/count the other cell doors; however, the View Two camera shows they walked past the next wall panel that held the magnetic window screens, and then past the next pair of cells, so they were five cells past Greene's before they turned around and came back.

simultaneously startled by hearing a loud noise behind them; they then walk back toward Greene's cell at a slightly quickened pace. This is inconsistent with Greene's claim that the COs walked away after warning him, before "[t]hey came back to my cell . . . out the blue (no reason) . . to spray me[.]" ECF No. 1 at 8. However, it _is_ consistent with the facts that were provided in the multiple incident reports by the defendants and other non-party corrections personnel, and the sworn affidavit of the Warden, contemporaneously prepared well before litigation ensued.

By 5.23.18 p.m., the COs are back at Greene's cell, standing close to his door and speaking to him through it, consistent with Greene's claim that they "told me to back up so he could spray me." ECF No. 1-1 at 2. At 5.23.26 p.m., the shorter CO opens the slot in the door of Greene's cell, and after a brief conversation, presumably when Greene was told to back up (so that he did not get OC spray directly in his face or on his skin), the taller CO briefly sprays OC spray into Greene's cell. Greene was sprayed with OC spray during the two-second interval between 5.23.27 – 5.23.29 p.m.

However, the hand-held camera footage shows that at 5.27.15 p.m., Greene, who was left unrestrained in his cell after being sprayed, and was being filmed through the window of his cell door by the CO with the camera, stepped over to the sink on the wall just to the right of his cell door window, leaned over, turned the

water on, began cupping handfuls of running water and repeatedly splashing it on his face. He did this for 1.5 minutes.[8]

Despite Greene's response in opposition claim that "the . . . defendants unlawfully used the spray on me for no reason at the time," (ECF No. 51 at 1), careful, thorough reviews of the surveillance video and hand-held video camera footage refutes this. Because there is no audio in any of the three HCC surveillance videos, only the first two of which capture the footage of the actual OC spray incident, it is unknown what was said between the parties after Greene was first warned that if he continued kicking his door he would be sprayed. Nonetheless, the record is consistent with Greene's claim that the COs cautioned Greene and then walked away, not "two cells down" as Greene contends, but at least five cells down the cell block before they suddenly stopped and spun around in unison, as if they simultaneously heard something loud enough to be heard from that distance, before they immediately returned and spoke briefly to Greene through the door before administering the OC spray. The record indicates that Greene resumed pressing his call light and kicking his cell door after the defendants directed him to stop; thus, the need for application of force was warranted. The correctional officers

---

[8]The COs did not arrive at his cell to take him to decontamination until 5.32.47 pm; it would seem that if Greene had really been that uncomfortable, he would have continued to avail himself of the opportunity to access the water at the sink to rinse the OC off his skin until they did arrive.

properly concluded that Greene was not responding to verbal commands before they used force. <u>Williams</u>, 77 F. 3d at 762. In sum, when reviewing the totality of the evidence, including the video footage, Greene's version of the events in the complaint is not credible and does not support Greene's version of the key factual dispute at issue here: whether Greene was complying with defendants' orders at the time he was pepper sprayed. To the contrary, even when drawing all reasonable inferences in his favor, the video evidence refutes Greene's claim.

"When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." <u>See</u> <u>Scott v. Harris</u>, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686, 694 (2007). Beyond the unsupported conclusory allegations to the contrary in Greene's admittedly verified complaint, and further attested to in his subsequent affidavit (ECF No. 88, ¶¶ 4-7 at 2), when weighed against the sworn declaration by the Warden of HCC and the facts in each of the contemporaneously-prepared incident reports by defendants and other non-party corrections personnel, long before any of them were aware that litigation would ensue, Greene has failed to present sufficient evidence to dispute the surveillance video evidence and defendants' assertions that the force applied on February 1, 2016

was applied in a good-faith effort to maintain or restore discipline, and not maliciously and sadistically to cause harm. Greene's conclusory allegations do not meet the "heightened pleading standard" required in actions against government officials. See Randall v. United States, 95 F.3d 339 (4th Cir. 1996); see also Dunbar Corp. v. Lindsey, 905 F.2d at 764.

### IV. Conclusion

For the reasons stated above, the plaintiff's excessive force claim is DENIED and DISMISSED with prejudice for failure to state a claim upon which relief can be granted under 28 U.S.C. § 1915(e)(2)(B)(ii). Further, the plaintiff's pending third and fourth Motions to Appoint Counsel (ECF No. 89, 90) and his Motion to Schedule Conference (ECF No. 93) are DENIED as moot. Accordingly, it is ORDERED that this civil action be DISMISSED WITH PREJUDICE and STRICKEN from the active docket of this Court.

Should the plaintiff choose to appeal the judgment of this Court to the United States Court of Appeals for the Fourth Circuit, he is ADVISED that he must file a notice of appeal with the Clerk of this Court within thirty days after the date of the entry of this order.

IT IS SO ORDERED.

The Clerk is DIRECTED to transmit a copy of this order to the pro se plaintiff by certified mail, return receipt requested, at his last known address as reflected on the docket, and to transmit

a copy electronically to all counsel of record. Pursuant to Federal Rule of Civil Procedure 58, the Clerk is DIRECTED to enter judgment on this matter.

    DATED:   March 1, 2019

 

                  /s/ Frederick P. Stamp, Jr.
                  FREDERICK P. STAMP, JR.
                  UNITED STATES DISTRICT JUDGE